*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. HENRIQUES, Minor.

UNPUBLISHED
June 12, 2025
2:01 PM

No. 373092
Kent Circuit Court
Family Division
LC No. 23-050690-NA

Before: BOONSTRA, P.J., and REDFORD and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to the minor child, CH, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

In October 2022, the trial court, pursuant to the emergency-removal request of the Department of Health and Human Services (DHHS), issued an ex-parte order temporarily removing CH from respondent's care and placing her in the care of her maternal grandmother based on respondent's repeated statements that she was unwilling to provide care for CH and wanted to place her in foster care.[1] At some point thereafter, CH was returned to respondent's care, and the two subsequently moved to Hawaii. In December 2022, Hawaii's Department of Human Services removed CH from respondent's care and initiated child-protective proceedings after receiving allegations that respondent had assaulted CH in the parking lot of a homeless shelter where they were residing. DHHS subsequently brought CH to Michigan in late-March 2023 to

---

[1] CH's two siblings were also temporarily removed from respondent's care and placed with their maternal grandmother, but because they were placed in a guardianship with their grandmother shortly thereafter, they were not substantially involved in the child-protective proceedings below.

begin living with her father,[2] but after less than two weeks, the trial court issued an ex-parte order immediately removing CH from his care and placing her in protective custody under the supervision of DHHS.[3] According to DHHS's emergency-removal request, during the few days that then-11-year-old CH had resided with her father, he had repeatedly kicked her out of his house for not contributing to the household or the bills, called her derogatory names, stated that he would break her jaw, and threatened to kill her. Immediately thereafter, DHHS filed a petition requesting that the trial court take jurisdiction over CH and remove her from respondent's and her father's care, alleging the aforementioned facts regarding respondent and CH's father in support of its request. Following a preliminary hearing, the trial court authorized the petition, instructed that CH remain out of her parents' care and in the care of DHHS, granted respondent supervised parenting time, and ordered DHHS to engage in reasonable efforts toward reunification.

During a combined adjudication and initial dispositional hearing in June 2023, respondent pleaded to several amended allegations in the petition[4] and to the court's exercise of jurisdiction. Respondent admitted that she had a criminal history, that she had a prior history with Children's Protective Services (CPS), that CH was removed from her care in Hawaii after an altercation, that CH was subsequently brought to Michigan to reside with her father, and that CH was placed with her maternal grandmother a few weeks later, all as detailed in the petition. Pursuant to the court's orders, which adopted the case service plan provided by DHHS, respondent was to engage in and benefit from offered services—made available to her both virtually in Michigan and in person in Hawaii—to address her issues with parenting skills, emotional instability, interpersonal communication, and unstable housing and employment. Respondent was also ordered to engage in parenting times with CH; given the distance between them, parenting times consisted of at least two 30-minute video or phone calls each week and occasional opportunities for in-person visits.

Throughout the dispositional review and permanency planning hearings, respondent struggled to demonstrate any progress on her case service plan. On multiple occasions, respondent moved across the country—including to New York for approximately three months and to Washington, D.C. toward the end of the case— without informing her caseworkers, which made it very difficult to locate and refer her to services. Respondent engaged in supervised phone calls with CH twice each week at the start of the case, but she repeatedly discussed inappropriate matters with CH, and she eventually requested that her parenting time be reduced to only one 30-minute

---

[2] CH's father was also a respondent in this case and had his parental rights to CH terminated as well, but he is not involved in this appeal.

[3] CH was placed in a licensed foster home at that time. CH's grandmother made clear at the time of the first removal that CH's placement with her was only temporary and that she could not provide longer-term care for CH, and the trial court was unable to locate any other relatives who were able or willing to act as CH's relative placement during these proceedings.

[4] The allegations were amended to remove certain, more detailed information to which respondent did not plead. For instance, respondent pleaded to the allegation that she had a history with Children's Protective Services (CPS) that resulted in substantiated claims in 2016 and 2022, but she did not plead to the specific details of those substantiated claims that were originally included in the petition.

phone call per week because she and CH "did not have . . . enough to talk about twice a week." Respondent also repeatedly refused all in-person parenting times offered to her in Michigan because she "want[ed] to move forward" from "her old life," and all in-person parenting times offered to her in Hawaii because she did not want her caseworkers "us[ing] [CH] to get a free vacation." Respondent was highly aggressive toward her caseworkers throughout the case, and she adamantly opposed all attempts, both virtual and in person, to verify the safety of her purported living arrangements in various locations. Although respondent participated in some counseling and parenting-education programs, she did not complete any of them due to her minimal attendance, and she was highly resistant to all other services offered to address all other areas of concern.

In August 2024, DHHS—at the trial court's direction—filed a supplemental petition requesting termination of respondent's parental rights. Following a contested termination hearing, the trial court found that clear and convincing evidence established grounds for termination of respondent's parental rights and that a preponderance of the evidence established that termination was in CH's best interests.[5] The trial court thereafter issued an order terminating respondent's parental rights as previously described. This appeal followed.

## II. DISCUSSION

On appeal, respondent does not challenge the trial court's findings that statutory grounds for termination of her parental rights were established by clear and convincing evidence and, instead, only challenges the court's determination that termination was in CH's best interests.

We review for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous when, even if some evidence supports the finding, we are nevertheless left with the firm and definite conviction that the trial court made a mistake. *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We give deference "to the special ability of the trial court to judge the credibility of witnesses." *Pederson*, 331 Mich App at 472 (quotation marks and citation omitted).

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 5 (quotation marks, citations, and alterations omitted). "Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 10 (citations

---

[5] The trial court orally announced its findings on the record at a separate hearing two days after the contested termination hearing.

omitted). The court may also consider "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption," *id*. (quotation marks, citation, and alteration omitted), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted).[6]

Respondent argues that the trial court gave inadequate weight to the parent-child bond and gave too much weight both to CH's need for permanency, stability, and finality and to the advantages of foster care over respondent's home. Specifically, respondent argues that the court "completely ignored" some presented evidence relevant to these factors and therefore erred by finding that they weighed in favor of termination. The record reflects, however, that the trial court thoughtfully considered all the evidence relevant to these factors before rendering its findings. The record also reflects that the court's findings were amply supported by the evidence presented.

Regarding the parent-child bond, the court found that CH and respondent had a weak bond and that this factor therefore weighed in favor of termination. The record is fully consistent with this finding. Contrary to respondent's argument on appeal, the court did acknowledge that CH had expressed a desire to return to respondent's care. But the court found, consistent with the caseworker's testimony, that CH only wished to do so because she "desire[d] to run the streets and have no rules," and "there are no rules" while in respondent's care. The court also noted, consistent with the testimony of the caseworker and guardian ad litem, that CH had expressed that she felt that respondent "d[id] not want her" and that CH had not appeared upset when discussing the possibility of termination with the guardian ad litem a few days before the termination hearing. And the caseworker further testified that the minimal bond between CH and respondent could easily be broken with no lasting impact on CH's emotional development and well-being.

Regarding CH's need for permanency, stability, and finality and the advantages of foster care over respondent's home, the court found that those factors weighed in favor of termination. The court found that respondent was not "stable emotionally" and that it would take a minimum of "nine months to a year . . . for reunification to occur" even if respondent "immediately and fully invested in [her] treatment plan," which it had no reason to believe that she would do given her resistance to and poor participation in services throughout the case. And, contrary to respondent's argument on appeal, the court also accounted for CH's placement history and status in its findings. The court noted that, due to her "behavioral issues and high needs," CH had been in 15 different placements throughout the 21-month pendency of this case and was placed in a residential placement at the time of termination. The court found that although a residential placement was "never preferable to a home, whether it be a foster home or parent's home," it nonetheless weighed in favor of termination here because respondent's home was not appropriate for CH and would

---

[6] In addition, "[a] child's placement with relatives is a factor that the trial court is required to consider when making its best-interests determination, and a child's placement with relatives weighs against termination." *CJM*, ___ Mich App at ___; slip op at 4 (quotation marks, citation, and alteration omitted). As noted, the possibility of a relative placement for CH was duly considered in this case, but no such option was available; respondent does not suggest otherwise.

"only result in further trauma to her," and the residential placement was "really . . . the only hope at this point that she has."

The record is again consistent with these findings. Testimony established that respondent was very resistant to services in all areas of concern, having minimally participated in parenting-education classes and in brief counseling sessions, and she was in no better position than she was in when CH was first removed from her care. Respondent verbally abused her caseworkers throughout the case, often accusing them of using drugs or "molesting children" if they said or did anything she disagreed with, and she would repeatedly email a multitude of government employees—including DHHS supervisors and the former President of the United States—any time her caseworkers did not respond to her emails within five minutes. Respondent demonstrated emotional instability during her parenting-time phone calls with CH as well; respondent, on multiple occasions, had made negative comments about the caseworkers to CH despite repeatedly being told not to do so, and had sworn at CH and threatened to "leave her in foster care" when CH said something that upset her and when CH informed respondent that she had been sexually assaulted.

As to the advantages of foster care over respondent's home, the caseworker testified that CH had been in 15 different placements throughout the case; that CH had, unfortunately, been sexually assaulted in one of those placements; and that CH was eventually placed in a residential facility to receive the treatment necessary to address her needs. The caseworker testified that even though a residential placement was not ideal, it was CH's best option because of her high needs and low likelihood of adoption and because respondent had demonstrated no ability to care for CH or meet her needs. This included respondent being dismissive of CH's "[s]ignificant behavioral issues," suicidal ideations, and self-harming behaviors when brought to her attention, stating that such issues were simply "normal" for CH to experience.

Furthermore, even if the trial court erred in any of its findings regarding these factors, they are just three of many considerations relevant to a best-interests determination. See *Simpson*, ___ Mich App at ___; slip op at 5. The trial court properly considered several other factors relevant to its best-interests determination, including respondent's noncompliance with her case service plan; respondent's parenting ability; respondent's history of domestic violence and engagement in questionable relationships; respondent's visitation history with CH; CH's well-being while in care; the possibility of adoption; and CH's preferences.[7] As previously mentioned, respondent never visited CH in person despite many opportunities to do so, and she decreased her parenting time relatively early on in the case. There was also significant evidence that respondent largely refused to participate in and benefit from nearly all services offered to her, including services meant to address her issues with emotional stability, parenting skills, domestic violence, housing, and employment. Although respondent participated in some parenting-education and mental-health services, she was unable to complete or demonstrate any benefit from any of the programs due to her minimal participation. Respondent took no responsibility for her role in CH's removal, insisting at the termination hearing that the individual who witnessed her altercation with CH in

---

[7] The court also considered any bond between CH and her siblings but determined that this was "a neutral factor" because there was "no evidence regarding any bond" between them.

-5-

Hawaii lied about what had occurred and that she had actually allowed CH to return to her father's care in Michigan rather than the court having removed CH from her care. Respondent also denied having any barriers to reunification and minimized her extensive nonparticipation in services, maintaining that CH had not been returned to her care simply because she had not formally completed a parenting class. And, as discussed, the court also duly considered the record evidence regarding CH's preferences, her well-being while in care, and the possibility of adoption. Respondent may disagree with how the court weighed these various considerations, but she has not shown the court reversibly erred in doing so.

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *Pederson*, 331 Mich App at 472.

Affirmed.


/s/ Mark T. Boonstra
/s/ James Robert Redford
/s/ Philip P. Mariani